# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 25, 2013 Session

## STATE OF TENNESSEE v. ROBERT HURST AND DESTINY HURST

### Appeal from the Criminal Court for Knox County
### Nos. 95313A & 95313B      Bob R. McGee, Judge

### No. E2012-01409-CCA-R3-CD - Filed September 24, 2013

A Knox County jury found appellants Robert Hurst and Destiny Hurst guilty of four counts of felony murder; one count of second degree murder as a lesser-included offense of felony murder; one count of first degree premeditated murder; and two counts of especially aggravated robbery. They were found not guilty of two counts of especially aggravated kidnapping and not guilty of all counts of employing a firearm during a dangerous felony. The trial court imposed life sentences upon both appellants for the murder conviction,[1] a concurrent eighteen-year sentence for appellant Robert Hurst's especially aggravated robbery conviction, and a consecutive thirty-five-year sentence for appellant Destiny Hurst's especially aggravated robbery conviction. In this appeal, appellants jointly challenge the sufficiency of the convicting evidence underlying the felony murder convictions and the trial court's failure to poll the jury as to a witness's status as an accomplice. Appellant Robert Hurst argues that there was a conflict surrounding the manner in which authorities matched his fingerprint to the bloody fingerprint found at the scene. Appellant Destiny Hurst claims that the State committed a *Brady*[2] violation; that the trial court erred in permitting the State to present evidence of her other crimes, wrongs, or acts pursuant to Tennessee Rule of Evidence 404(b); and that the trial court erred in characterizing her as a professional criminal, sentencing her at the top of her range, and imposing consecutive sentences. Based on our review of the record as a whole, we affirm both appellants' convictions and sentences. However, for each appellant, we remand this cause for entry of a single judgment form reflecting merger of all counts of murder and a single judgment form reflecting merger of

---

[1] Although the technical record in both appellants' record on appeal is devoid of a judgment form reflecting their sentences for second degree murder, in its sentencing order, the trial court notes that all murder convictions would merge into the conviction for each appellant's Count 6, first degree premeditated murder. Because we are remanding this case for entry of one judgment on all murder convictions, it is unnecessary to supplement the record with a separate judgment form reflecting the disposition of the second degree murder convictions.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

both counts of especially aggravated robbery. Appellant Destiny Hurst's judgment for especially aggravated robbery should note consecutive sentence alignment of her thirty-five-year sentence with her life sentence for murder. We also note, with respect to appellant Destiny Hurst, that the record does not contain a judgment form for Count 12, knowingly employing a firearm during the commission of a dangerous felony after having been previously convicted of the same. Thus, we order the criminal court to supplement the record with a judgment form reflecting the jury's verdict of not guilty on this count of the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Robert Hurst.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellant, Destiny Hurst.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case concerns the murder of James Mullins committed during a theft and especially aggravated robbery at the store he owned and operated.

I.  Facts from Trial

The State called James Palmer as its first witness. Mr. Palmer testified that he had known the victim for twenty to twenty-five years and that he frequented the "variety" store that the victim had operated. Mr. Palmer drove to the victim's store on September 22, 2009, to purchase cigarettes. When he entered, he noticed that the security door had been pushed into an open position, and the other exit door was also open. He continued to walk inside the store, and when he looked down the center aisle, he noticed the victim's leg protruding into the aisle. As Mr. Palmer progressed, he looked down the next aisle and saw that the victim was on the floor with a pool of blood around him. Mr. Palmer dialed 9-1-1. While he was on the telephone with the operator, he observed a 1984 or 1985 blue and silver Chevrolet S-

10 pick-up truck pulling away from the store via the driveway. He walked back inside, checked the victim, and advised the operator that the victim was still warm.

The State's next witness was McKenzie Alleman, a crime scene technician with the Knox County Sheriff's Department. He testified that he responded to the crime scene located at 10011 Rutledge Pike. Through Officer Alleman, the State introduced a videotape of the crime scene, which Officer Alleman narrated as the State played it for the jury. As he reviewed the photographs of the crime scene, Officer Alleman noted that he located an OshKosh clothing tag just inside the front door of the store. The tag had blood on both sides. Other items were identified and marked as evidence, including .38 caliber live ammunition and a tag that had been removed from a pair of gloves. Officer Alleman testified that other individuals were responsible for processing fingerprints and shoe prints that were left in the blood.

After appellants were identified as suspects, Officer Alleman also assisted in executing a search warrant for appellants' residence in January 2010. He identified a fixed-blade knife that officers found lodged between appellants' mattress and box spring. He testified that officers removed several pairs of shoes for testing against the shoeprints from the crime scene. They also seized a Tupperware container that was missing its lid, wrappers used for wrapping paper money, and several coin wrappers. Officer Alleman explained that officers did not search the portion of the residence occupied by Michelle Smith. He further commented that as part of his investigation, he contacted the OshKosh corporation and learned that the tag he collected came from an extra large boy's coat.

The State next called Trina Gregory, an officer with the forensic services division of the Knox County Sheriff's Department. She responded to the crime scene at 10011 Rutledge Pike. Officer Gregory explained that she located "transfer" stains, which were partial shoe tread prints. She noted the presence of "low-velocity impact" stains, which were consistent with the victim's standing up and bleeding, resulting in blood droplets hitting the floor. She observed "medium-velocity impact" stains, as well. Officer Gregory also assisted in executing the search warrant of appellants' residence.

The State's next witness was Officer Tom Finch, who was assigned to the crime scene unit of the Knox County Sheriff's Department. He responded to the crime scene, where he focused his attention on fingerprints and shoe prints located in the pool of blood. He photographed the shoe prints he observed, then swabbed them and "developed them with amido black, which brings them out and fix[es] them in place." He downloaded the photographs and sent them to the Federal Bureau of Investigation ("FBI") for assistance in identifying the shoe print.

Before Officer Finch testified with regard to fingerprint analysis, the State offered him as an expert witness in the area of latent fingerprint analysis. Following voir dire, the trial court accepted Officer Finch as an expert in that field. Officer Finch indicated that he would confirm a fingerprint match if he observed ten to twelve "minutiae points" from each print that matched. He testified that he believed the FBI considered eight points to be a match. He further opined that whether a match existed was in large part a matter of discretion with the reader or interpreter of the evidence.

Officer Finch stated that his primary concern at the crime scene was the presence of fingerprints in the blood; he focused on examining latent prints collected by other officers the following day. When he examined items of evidence for latent prints, he discovered a print on the tag that had been removed from the pair of gloves and was able to "lift" it. He ran it through a local database and a nationwide database but found no match. He mailed the fingerprint to the FBI so their analysts could attempt to find a match, but they were unsuccessful as well. In January 2010, Officer Finch had the opportunity to compare the latent fingerprint from the crime scene with appellant Robert Hurst's fingerprint, and he concluded that the two prints matched, based on his finding sixteen or seventeen points in common. Sergeant Brad Park and Officer Aaron Allen confirmed his opinion.

The State's next witness was Keith Proctor, a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI"). The State offered him as an expert witness in the areas of serology and DNA analysis, and the trial court accepted him as such. Special Agent Proctor stated that he performed initial DNA testing on blood found at the crime scene and determined that it belonged to the victim. He also performed DNA testing on the clothing tag that was found at the crime scene. He concluded that the blood sample on the tag contained two different DNA profiles, one from a "major" contributor and one from a "minor" contributor. The major contributor's sample was consistent with the victim's DNA profile, but testing of the minor contributor's sample was inconclusive.

Special Agent Proctor testified that he performed a subsequent analysis on two knives and a steering wheel cover in January 2010. His analysis failed to yield the presence of blood; thus, he did not perform DNA testing on those items.

The State called Sergeant Brad Park with the crime scene unit of the Knox County Sheriff's Department as its next witness. Without objection, the trial court accepted him as an expert in the field of latent print examination. As part of his responsibilities at the crime scene, he recovered partial palm print from a counter top near the entrance of the store and partial prints from the bottom of the cash register tray. He also collected a tag from a pair of gloves that he analyzed the following day.

-4-

Sergeant Park testified that after officers obtained the shoe print left in the blood, he forwarded the print to the FBI for comparison. The FBI was able to determine that the shoe print was consistent with a Nike Team Trust III athletic shoe. Sergeant Park also explained that per departmental policy, he reviewed Officer Finch's comparison of the latent print with appellant Robert Hurst's print and confirmed that the two prints were, in fact, a match. He also described the shortcomings involved in using a computer-aided database to attempt to obtain a fingerprint match.

Sergeant Park stated that he participated in the execution of the search warrant of appellants' residence, where he focused his attention on processing their vehicle. He and other officers obtained several samples of the carpeting and material inside the vehicle but did not discover the presence of blood on any of the samples.

The State's next witness was Eric Gilkerson, an FBI forensic examiner based in Quantico, Virginia. Mr. Gilkerson testified that he specialized in the identification of shoe prints and tire tread prints. He testified that the shoe print left at the crime scene was made by a Nike Team Trust III athletic shoe. It did not match the Nike tennis shoe that officers seized during execution of the search warrant at appellants' home.

The trial court next conducted a 404(b) hearing concerning the proposed testimony of State's witness Michelle Smith. *See* Tenn. R. Evid. 404(b). In the jury-out hearing, Ms. Smith testified that beginning in July 2009, she and appellant Destiny Hurst would steal from stores such as Walmart, Lowe's, Home Depot, and Kohl's and would sell the stolen merchandise to other people for half of the listed price. In August 2009, the two women committed such a theft at Kohl's department store in Kingsport, Tennessee. Ms. Smith stated that during that offense, appellant Destiny Hurst stole a pair of men's Nike Team Trust III athletic shoes and gave them to her husband. The State introduced a videotape of the crime, as well as the 9-1-1 recording reporting the theft and the judgment form from appellant Destiny Hurst's guilty plea to theft.

Ms. Smith further testified in the jury-out hearing that on September 22, 2009, she and both appellants were in need of money. The three of them attempted to perpetrate a theft at a hardware store. Appellant Destiny Hurst planned to "hustle" a Dewalt combination tool set, valued at $800, so she could sell it for $400 and have money for pills. They attempted the theft at three different stores but were unsuccessful. Ms. Smith testified that despite the failed attempts, later in the evening of September 22, 2009, appellants had obtained pills. The State introduced videotapes of each of the attempts.

The State argued that the evidence from the Kohl's theft was relevant to establish identity and evidence of the attempted thefts was relevant to establish motive. Appellants'

-5-

counsel both argued that the evidence was being offered as propensity evidence. The trial court found that the evidence of appellant's other crimes, wrongs, or acts was clear and convincing and that it could be received as probative of identity and motive. After weighing the probative value of the evidence against the prejudicial effect, the trial court found the evidence highly probative and the danger of unfair prejudice low. The trial court allowed Ms. Smith's testimony, the videotapes, and the documentary evidence.

Ms. Smith then testified before the jury. She stated that she met appellants in July 2009, and she, her husband, and their two daughters moved in with appellants shortly thereafter. Ms. Smith explained that on August 23, 2009, she and appellant Destiny Hurst were "hustling" various stores, including Walmart and Kohl's. Appellant Destiny Hurst would go into a store and fill a bag or shopping cart with merchandise. As she was about to exit the store, she would call Ms. Smith on her cellular telephone to alert Ms. Smith that she was leaving. Ms. Smith would open the passenger side door so that appellant Destiny could run and jump into the front seat of the vehicle. On that particular day, they "hustled" at a Kohl's store, and appellant stole clothing, jewelry, perfume, and a pair of men's Nike tennis shoes for her husband. Ms. Smith recalled having seen appellant Robert Hurst wear the shoes after they were given to him.

Ms. Smith explained that on September 22, 2009, her husband was incarcerated. After her children boarded the school bus that morning, she and appellants were going to "hustle" a hardware store to obtain an $800 tool set that appellant Destiny Hurst planned to sell for $400. Neither Ms. Smith nor appellants had any money. The rent was due; they were out of cigarettes; and they were all "pill sick," meaning that they were physically ill from having not consumed pills lately. Ms. Smith described the three aforementioned failed theft attempts. She then stated that they all returned home, where she folded laundry and began dinner preparations. At some point, appellants left the residence. Ms. Smith remembered that appellants returned around 4:00 p.m. because they returned before her children arrived home on the school bus. She testified that appellant Robert Hurst was wearing the tennis shoes that appellant Destiny Hurst stole from Kohl's.

Ms. Smith further testified that appellant Robert Hurst immediately went to the bathroom to shower. Appellant Destiny Hurst asked Ms. Smith if she had a first aid kit because her husband had been cut. They explained that he had been bitten by their dog. Ms. Smith located the first aid kit and offered assistance to appellant Robert Hurst by bandaging his arm after he finished showering. She noticed small drops of blood on the shirt he had been wearing and blood on appellant Destiny Hurst's shirt, as well. Ms. Smith witnessed appellants place the clothing and shoes that they had been wearing, including the Nike tennis shoes, into a large bag. They left the residence shortly thereafter and took the bag with them. Ms. Smith never saw the bag or the clothing again.

-6-

Ms. Smith stated that when she was bandaging appellant Robert Hurst's arm, he gave her two and one-half packs of Marlboro "red" cigarettes. Later in the day, after appellants had returned to the residence a second time, they gave Ms. Smith two and one-half "Roxy 30's." She indicated that each of appellants also had the same number of pills, which, in her estimation, sold for approximately $25 each. They also gave her $20. When Ms. Smith received the $20, she and appellant Destiny Hurst drove to a local store so that Ms. Smith could purchase menthol cigarettes. They drove past the crime scene at 10011 Rutledge Pike, and appellant Destiny Hurst commented, "'I wonder what's going on. I wonder what happened.'"

The following day, appellant Robert Hurst inquired of Ms. Smith whether she knew where he could get rid of a .38 handgun. Ms. Smith advised that perhaps he could trade it to a drug dealer in the "projects" for drugs, but being a convicted felon, she could not be in the vehicle with him when he attempted to do so. The day after that, Ms. Smith asked appellant Destiny Hurst if they were still trying to dispose of the weapon. Appellant Destiny Hurst advised Ms. Smith that they had gotten rid of it and that no one would ever find it.

Ms. Smith recalled that sometime prior to the date of the robbery and murder, she, her husband, and appellants had a conversation wherein appellant Robert Hurst displayed a small "BB" gun that resembled a pistol and tried to convince Ms. Smith's husband to participate in a robbery of a "country" store that did not have video surveillance. Mr. Smith refused to do so. After the murder, Ms. Smith and appellants acquired a newspaper and read about the facts. They noted a sign in front of the store offering a reward, and appellant Destiny Hurst commented to Ms. Smith that "$25,000 would really help her change her life." Appellant Destiny Hurst also expressed a desire to attend the candlelight vigil being held for the victim, but Ms. Smith declined because she did not personally know the victim. Appellant said she wanted to go because all of the neighbors would be there.

On December 26, 2009, Ms. Smith overheard appellant Destiny Hurst's side of a telephone conversation, which prompted Ms. Smith to inquire further. Appellant Destiny Hurst told Ms. Smith about their involvement in the victim's murder. She stated that she had used a belt in an attempt to strangle the victim after he had been stabbed, but that the victim "wouldn't die." Ms. Smith did not report the conversation to the police because appellant Destiny Hurst advised that she would be considered an accessory to the murder.

In January 2010, officers from the Knox County Sheriff's Department interviewed Ms. Smith. During the interview, she explained that appellant Robert Hurst brought home the Tupperware container that the police seized during execution of the search warrant. When he brought it into the residence on September 22, 2009, it contained rolls of coins. Because

Ms. Smith was in fear, she subsequently left Tennessee and went to Oklahoma. She was later extradited by Tennessee and was arrested on three unrelated counts of aggravated burglary.

The State's next witness was Joseph Harrison, a loss prevention supervisor with Kohl's Department Store. He received a call in August 2009 from a female associate who reported that a woman had run from the store carrying a bag of stolen merchandise. The following day, he reviewed the video footage and witnessed a woman running from the store. He noted that the bag she carried contained clothing, perfume, and an orange shoe box. He identified the shoe box as the Nike brand. At that time, Kohl's sold Nike Team Trust III athletic shoes. Mr. Harrison testified that vehicle in which the woman drove away was a white Jeep and bore the license plate number of 826 WCB.

James Adair, a loss prevention officer with Lowe's in East Knoxville, next testified. He was working on September 22, 2009, when he was alerted that a female was attempting to exit the store via the lawn and garden department with a combination tool kit that she had not purchased. He examined the video footage and noted that at times, the woman attempted to conceal the tool kit by covering it with the bag that was included in the set. When the woman approached the exit, she was stopped by a sales associate.

Donna Grubbs, also an employee of Lowe's, testified that she was working the gate of the lawn and garden center on September 22, 2009. A woman pushing a combination tool set in a shopping cart approached the gate and said that she was going outside to shop for plants on the sidewalk. Ms. Grubbs informed the woman that they were not permitted to take such items outside without paying for them first and that she would safeguard the toolkit for the woman. Ms. Grubbs could a hear a man calling to the woman from outside the gate, telling her to leave. The woman said that she would go back inside and shop some more but later returned and again tried to leave through the gate with the tool set. Ms. Grubbs did not allow her to do so, and upon hearing the man's voice call again, the woman left the store.

Jamie Rupp, the State's next witness, was employed by a different Lowe's in Knoxville. She received a telephone call from the East Knoxville Lowe's on September 22, 2009, to be alert to a woman trying to steal a Dewalt combination tool kit. Ms. Rupp watched the tool area of the store and observed a woman pick up a drill set, examine it, and replace it on the shelf. The woman then picked up the combination tool set and placed it in her shopping cart. She proceeded toward the exit door, paused, and looked back and forth at the door several times. She then walked back through the store, approached the exit again, and left the building without attempting to steal the combination tool set.

The State's next witness was Brian Lusk, who worked with appellant Robert Hurst at Lusk Roofing and Guttering, which was owned by Mr. Lusk's brother. After the victim

was killed, Mr. Lusk and appellant were working together out of town. Appellant told Mr. Lusk that he had packs of cigarettes for sale for $2.00 each. Mr. Lusk found it odd because he had never known appellant to have anything to sell. Mr. Lusk also stated that appellant had offered him a pair of socks but that the socks appeared to have a blood stain on them. He recalled seeing appellant with scrapes and bandages on his arm.

Arlie Lusk, the owner of Lusk Roofing and Guttering, testified next. He indicated that appellant Robert Hurst was scheduled to work on September 22, 2009, but that he did not show up for work that day.

The State introduced the 9-1-1 recording through Michael Allen Mayes, the custodian of records for the Knox County Emergency Communications District. James Palmer made the 9-1-1 call, which was received at 4:05 p.m. on September 22, 2009. Mr. Mayes also reviewed the recordings of two other calls that were received that evening. The callers both indicated that a vehicle bearing appellants' tag number was "all over the road," which, the State asserted, corroborated Ms. Smith's testimony that appellants purchased pills after the murder.

The next witness called by the State was Don Carman, a forensic scientist supervisor with the firearms identification unit of the Metro Nashville Police Department. He was employed by TBI at the time of the investigation in this case and performed the firearm identification. The trial court accepted him as an expert in the fields of firearm and tool mark identification. Agent Carman examined five unfired .38 caliber cartridges, one fired .38 or .357 caliber metal bullet jacket, and some bullet fragments recovered from the victim. He explained that the only difference between a .357 caliber bullet and a .38 caliber bullet is the cartridge or casing. Both size cartridges use a .38 caliber bullet, and manufacturers use them interchangeably. Agent Carman testified that the bullet that was retrieved from the victim was consistent with a .38 caliber weapon; however, he did not receive a weapon with which to compare the fired cartridge or the spent bullets.

Bobbi Mullins, the victim's sister, was called by the State as its next witness. Ms. Mullins stated that on September 22, 2009, she arrived at the store around 1:30 p.m. to sort out greeting cards. She also brought lunch to the victim. She left the store around 2:45 p.m. Ms. Mullins stated that the victim kept a gun under the counter. She confirmed that the store sold Marlboro cigarettes and that the victim kept rolled coins in a Tupperware container behind the counter. When she left the store, the gun was still under the counter.

Dr. Steven Cogswell, a forensic pathologist, testified that he was employed by the Regional Forensic Medical Center as the deputy chief medical examiner and that he performed the autopsy on the victim. The trial court accepted him as an expert in forensic

pathology. Dr. Cogswell testified that from the blood pattern on the victim's shoes, he ascertained that the victim was standing when he began bleeding because he dripped blood onto his shoes. Because there was blood on the soles of the shoes, he gleaned that the victim was walking through his blood.

Dr. Cogswell identified an abrasion and a bruise along the right side of the victim's cheek and eyelid, a bruise and a scrape along the right side of his chin, a stab wound to the neck, and a row of stab wounds along the left side of the victim's chest. He also noted a "squared off" abrasion on the right side of the victim's neck that ran from the right side of his throat to the corner of his jaw, running horizontally on the neck, which he characterized as a "compression abrasion" that was consistent with a belt being pressed or pulled against the neck. From the photographs, Dr. Cogswell identified the gunshot wound to the victim's head and the stippling that was associated with it. Reviewing the stab wounds, Dr. Cogswell noted injuries to the left lung, the spleen, and the liver, as well as stab wounds to the back and defensive-type injuries on the back of the victim's arms and hands. He noted twenty-eight total stab or incise wounds. He opined that the cause of the victim's death was the combination of multiple sharp force injuries of the neck, torso, arms, and hands and a gunshot wound to the head. Dr. Cogswell examined Exhibit 109, the knife that was recovered from appellants' residence, and stated that the victim's injuries were consistent with being inflicted by that particular knife. He concluded that the manner of death was homicide. Following this testimony, the State rested its case-in-chief.

Appellant Robert Hurst presented Matt Sexton, a deputy with the Knox County Sheriff's Department, as his first witness. Deputy Sexton testified that they continued to take photographs and document the vehicles that drove past or stopped at the crime scene because perpetrators often returned to the scene of a crime. He photographed appellant Destiny Hurst and Ms. Smith, who had stopped their vehicle and opened a door in the area outside of the crime scene. He was not aware of whether appellant Robert Hurst had returned to the crime scene.

On cross-examination, Deputy Sexton explained that the steps taken in trying to determine the identity of the perpetrators. He stated that they began with the bloody fingerprint that was taken from the clothing tag. They later received a tip from Sonny Mullins, the victim's brother, concerning appellant Robert Hurst. Officer Finch then matched the bloody fingerprint with appellant Hurst's fingerprint. Other officers were involved in executing the search warrant at appellants' residence. Deputy Sexton was involved with the interview of Ms. Smith, and he attempted to corroborate as much of her statement as possible. To do so, they obtained the video surveillance from Kohl's and Lowe's. The Tupperware container and empty coin rolls seized at appellants' residence also corroborated Ms. Smith's statement.

-10-

Appellant Robert Hurst next called Stevie Isom, who had been incarcerated with Ms. Smith since November 2011. Ms. Isom claimed that Ms. Smith had confided that she had been seated in the Jeep in the parking lot outside of the store when the murder occurred. Ms. Smith told Ms. Isom that she "freaked out" when she heard the gunshot. Ms. Smith also allegedly told Ms. Isom that when they returned to their home, she helped appellants clean up, assisted them in disposing of the bags of their clothing, and bandaged appellant Robert Hurst's arm because he had been scratched by the victim.

On cross-examination, Ms. Isom stated that Ms. Smith told her that appellants exited the Jeep and entered the store because appellant Robert Hurst had discussed robbing the store. After the gunshot, Ms. Smith said that appellants fled from the store, and appellant Robert Hurst instructed her to drive normally as they left. Ms. Smith described to Ms. Isom that appellants had blood on them. She also told Ms. Isom that appellants gave her two and one-half thirty-milligram Roxys later that day.

Appellant Robert Hurst's final witness was Rashena Weston, who had also been incarcerated with Ms. Smith. Ms. Weston confirmed that Ms. Smith had stated that she was present in the Jeep outside of the store when the murder was committed, that she was "paid" with two and one-half Roxys, and that she bandaged appellant Robert Hurst's arm. Ms. Smith also told Ms. Weston that appellants had tried to strangle the victim, but he would not die, so they had to shoot him.

Following deliberations, the jury found both appellants guilty of four counts of felony murder (committed during the attempt to perpetrate theft, during the perpetration of theft, during the attempt to perpetrate robbery, and during the perpetration of robbery); one count of second degree murder, a lesser-included offense of felony murder; one count of premeditated first degree murder; and two counts of especially aggravated robbery (by taking with violence and by placing the victim in fear). The jury found both appellants not guilty of two counts of especially aggravated kidnapping, appellant Robert Hurst not guilty of one count of employing a firearm during the commission of a dangerous felony, and appellant Destiny Hurst not guilty of two counts of employing a firearm during the commission of a dangerous felony, one of which was based on a prior conviction for the same. In its sentencing order, the trial court merged all murder convictions into Count 6, first degree premeditated murder, because they each involved the same victim. It sentenced each appellant to life in prison for that conviction. It sentenced appellant Robert Hurst to eighteen years for especially aggravated robbery, to be served concurrently with his life sentence, and appellant Destiny Hurst to thirty-five years for especially aggravated robbery, to be served consecutively to her life sentence. The trial court denied appellants' motions for a new trial, and this appeal follows.

## II. Analysis

Appellant Robert Hurst advances the following issues on appeal from his convictions: (1) sufficiency of the evidence supporting his conviction for felony murder committed during a theft or attempted theft; (2) sufficiency of the evidence supporting his conviction for felony murder committed during a robbery or attempted robbery; (3) sufficiency of the evidence supporting his conviction for felony murder committed during an especially aggravated robbery or attempted especially aggravated robbery;[3] (4) the conflict surrounding the manner in which authorities matched his fingerprint to the bloody fingerprint found at the scene; and (5) the trial court's failure to poll the jury as to Michelle Smith's status as an accomplice. Appellant Destiny Hurst raises the following claims of error on appeal: (1) the trial court's denying her motion for judgment of acquittal based on insufficient evidence; (2) the State's failure to corroborate the testimony of the alleged accomplice Michelle Smith; (3) alleged *Brady* violations committed by the State; (4) the trial court's permitting the State to present evidence of other crimes, wrongs, or acts pursuant to Tennessee Rule of Evidence 404(b); (5) the trial court's failure to poll the jury as to Michelle Smith's status as an accomplice; and (6) the trial court's characterizing her as a professional criminal, sentencing her at the top of her range, and imposing consecutive sentences.

### A. Sufficiency of the Evidence

### 1. Applicable Law

### a. Standard of Review for Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence,

---

[3] Appellant Robert Hurst raises sufficiency of the evidence underlying felony murder committed during the perpetration of or attempt to perpetrate especially aggravated robbery as an issue. However, because appellant was neither charged with nor convicted of this offense, we will not address this issue in our analysis. Insofar as he may be asserting insufficiency of the evidence underlying the conviction for especially aggravated robbery, we conclude that sufficient evidence supports this conviction.

or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

### b. Felony Murder

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2)(2010). Tennessee Code Annotated section 39-13-202 also provides that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts."

### c. Accomplice Testimony

Further, when a conviction is supported by the testimony of an accomplice, it is necessary to ascertain the sufficiency of the evidence in terms of whether the State presented corroboration of any accomplice's testimony. "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689 (Tenn. 2001)). Our supreme court has explained:

There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Id.* at 419.

This court reiterated, "An accomplice is defined as one who 'knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument.'" *State v. Tyree Robinson*, W2008-01001-CCA-R3-CD, 2009 WL 1741401, at *7 (Tenn. Crim. App. June 16, 2009) (quoting *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997)). The pivotal inquiry into whether a witness is an accomplice rests upon "whether the witness could be indicted for the same offense as the defendant." *Id.* (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990)).

### 2. Appellant Robert Hurst's Conviction for Felony Murder Committed during a Theft or Attempted Theft

We review these claims in light of the applicable law set forth *supra*. Specific to this issue, theft of property is defined as follows: "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a).

The evidence, viewed in the light most favorable to the State, establishes that appellant Robert Hurst's bloody fingerprint was found at the scene of the victim's murder. He was later seen by Ms. Smith in possession of the Tupperware container that the victim used to store rolled coins, as well as empty coin roll wrappers. Law enforcement officers seized that evidence when they executed the search warrant at appellant's residence. Appellant Robert Hurst was seen wearing a pair of Nike athletic shoes that matched the shoe tread print left in the victim's blood at the scene. Although the shoes were never recovered, the witness from Kohl's confirmed that appellant Destiny Hurst stole the same shoes from their store. Ms. Smith testified that while appellants did not have money for cigarettes or pills earlier on the day of September 22, 2009, after they left together and returned later in

the afternoon, they had cigarettes for everyone and pills to share. Ms. Smith witnessed appellants' bloody clothing and bandaged appellant Robert Hurst's arm after being scratched, injuries which he asserted were caused by a dog. Ms. Smith also testified to a conversation involving appellant Robert Hurst and her husband in which appellant suggested that they rob a "country" store that did not have video surveillance. The evidence established that appellant Robert Hurst stole rolled coins, cash, and cigarettes from the victim's store. Moreover, the proof clearly demonstrated that the victim was killed during the course of the theft. From this evidence, the jury had sufficient evidence by which to convict appellant Robert Hurst of felony murder committed during a theft or attempted theft.

### 3. Appellant Robert Hurst's Conviction for Felony Murder Committed during a Robbery or Attempted Robbery

Specific to this issue, robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). Appellant reiterates the same arguments as set forth in his first issue, *supra*, but adds that there is no evidence of any prior intent to rob the victim. He posits that "[i]t is just as likely that an unplanned confrontation took place that resulted in [the victim's] death" and that perhaps after the "tragedy," appellant or his accomplice took items from the store, thereby committing a misdemeanor theft.

With regard to appellant's argument, our supreme court has stated that in felony murder cases, "[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." *Thacker*, 164 S.W.2d at 223 (citations and quotations omitted). "The killing 'may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of"' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Id.* (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)).

The evidence presented establishes a connection in time, place, and continuity of action. In addition, the medical examiner's testimony clearly proves that the taking of the victim's property was accomplished by extreme violence. Moreover, the jury resolved all factual disputes raised by the evidence in favor of the State. *See Bland*, 958 S.W.2d at 659. We cannot say that "no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319. The evidence establishing appellant's identity as well as other supporting evidence, as set forth above, is sufficient to support appellant's conviction for felony murder committed during the course of a robbery or attempted robbery.

### 4. Appellant Destiny Hurst's Convictions for Felony Murder

In her brief, appellant Destiny Hurst does not specify which conviction(s) for felony murder she is contesting for lack of evidence. She simply asserts that "the only evidence linking Ms. Hurst is the uncorroberated [sic] testimony of Ms. Michelle Smith, an accomplice."

Ms. Smith witnessed appellants return to their residence with blood on their clothing and watched them dispose of the clothing and shoes in a bag. Appellants shared cigarettes and pills with Ms. Smith, which they did not have the money to purchase earlier in the day, supporting the conviction for felony murder committed during perpetration of or attempt to perpetrate a theft. In addition, Michelle Smith overheard appellant Destiny Hurst's end of a telephone call, which prompted a conversation between them wherein appellant stated that she tried to strangle the victim with a belt, but he would not die, supporting the conviction for felony murder committed during perpetration of or attempt to perpetrate robbery by means of violence. The medical examiner's testimony corroborated that the victim sustained injuries that were, in fact, consistent with being strangled by a belt.

After defining "accomplice" and "corroboration" in its jury instructions, the trial court stated, "In this case[,] it is a question for the jury to determine whether the witness, Michelle Smith, was an accomplice in this alleged crime." It further instructed:

> If you find from the proof that the witness was an accomplice, then the defendant cannot be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to her testimony just as you do that of any other witnesses in the case.

Even if the jury found that Ms. Smith was an accomplice, the State presented sufficient evidence to corroborate her testimony. Ms. Smith testified that on the day of the robbery-murder of the victim, appellants brought home a Tupperware container that was missing its lid. Police officers collected the Tupperware container from appellants' residence, and Ms. Mullins, the victim's sister, confirmed that the Tupperware container was used by the victim in his store. Ms. Smith testified that appellant Destiny Hurst said she had tried to strangle the victim, and the medical examiner confirmed that the victim had been strangled. Ms. Smith testified about the common scheme to "hustle" various stores in the area, and the State presented evidence of this scheme from three different retail stores.

The jury was instructed on how to evaluate the evidence if it found that Ms. Smith was an accomplice and how to evaluate the evidence if it found that she was not. "[J]urors are presumed to follow the instructions given them absent evidence to the contrary." *State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003). We cannot say that "no reasonable trier

of fact could have found the essential elements of the offense beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319. The evidence establishing appellant's identity as well as other supporting evidence, as set forth above, is sufficient to support appellant's convictions for felony murder.

5. Allegations of a *Brady* Violation Based on
Non-Disclosure of the Jailhouse Witnesses

As part of her sufficiency argument, appellant Destiny Hurst maintains that the State violated the tenets of *Brady v. Maryland* by failing to disclose the existence of jailhouse witnesses who would testify that Ms. Smith had confessed her involvement to them and that Ms. Smith planned to lie on the witness stand.

In *Jordan v. State*, this court summarized the application of *Brady* as follows:

> In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." In *United States v. Bagley*, the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule.
>
> . . . .
>
> Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the defendant requested the information, unless the information was obviously exculpatory; (b) the prosecution must have suppressed the evidence; (c) the evidence suppressed must have been favorable to the accused; and (d) the evidence must have been material.
>
> . . . .
>
> Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. In *Kyles*, the United States Supreme Court explained that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." Rather, the question is whether the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence," in the absence of the suppressed evidence. In

-17-

order to prove a *Brady* violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." The Court in *Kyles* urged that the cumulative effect of the suppressed evidence be considered to determine materiality. Thus, the materiality of the suppressed evidence must be evaluated within the context of the entire record as to how it impacts the innocence or guilt of the accused.

*Jordan v. State*, 343 S.W.3d 84, 96-97 (Tenn. Crim. App. 2011) (internal citations omitted).

Appellant's *Brady* claim fails for several reasons. First, there is no evidence that the State withheld the evidence. In a jury-out hearing, counsel for appellant Robert Hurst announced:

Less than an hour ago[,] Ms. Fitzgerald approached me and said that one of the detectives in the sheriff's department had told her that an inmate had said that Michelle Smith had told her she was there at the scene. This just happened an hour ago or less. And it's to Ms. Fitzgerald's credit that she has told us that. So this comes as a surprise to everyone[,] including Ms. Fitzgerald.

The first witness, Ms. Isom, said that Ms. Smith first disclosed this information on the Thursday prior to trial. Ms. Isom also stated, "[E]ver since she told me that Thursday[,] . . . it's been bothering me. . . . [S]o I talked to an officer about it[,] and she said that if I wanted to that she could maybe talk to a detective. And I spoke with a detective and then here I am." She confirmed that she spoke with a "lady detective" on the day that she testified. Ms. Weston testified that Ms. Smith had only talked with her about the case for "the last couple of days." As such, we do not conclude that the State withheld evidence. The State disclosed the information as soon as it became aware of the witnesses.

B. Conflicting Evidence Surrounding Appellant Robert Hurst's Fingerprint

Appellant Robert Hurst submits that given the conflict surrounding the identification of his fingerprint, "the jury could not rely on the officer's testimony that the print was [appellant's] . . . beyond a reasonable doubt . . . ."

The trial court accepted Officer Finch as an expert in the area of latent fingerprint analysis. He testified that he entered the photograph of the latent fingerprint into several computerized databases but did not receive a match. He explained that the computer generated several possibilities, but upon his further examination, none of them matched the

latent fingerprint recovered from the scene. Demonstrating for the jury, Officer Finch testified with regard to how a computer may not recognize a known print in its database:

> [I]f one of these ridges stopped, it comes to a stop, that is a ridge ending. That is a minutiae point. On your finger[,] that's the way it is. That's the pattern, that's the design, that's the ridge flow that each person has. If I do construction, if I work something that I'm wearing my skin off, or I have injuries or scrapes, fingerprint powder that this is preserved in or the pressure on the fingerprint machine that's scanning your finger in, you may have two ridges that come together[,] and they do not meet. Well, that void area may be due to damage, or abrasion, or scratch, or scrape, so the computer reads it as two minutiae points, where in fact, it's still a continuous ridge on your finger. That's information that the computer is trying to decipher as it's searching. And you get enough of those discrepancies[,] the computer is going to eliminate that person, that pattern, as a potential person and go on to the next closest relationship of minutiae points that it thinks you're looking for.

Further, he stated:

> The computer doesn't match a fingerprint anyway. It's the examiner who makes the final decision.
>
> . . . .
>
> [The computer] looks at what it's got in its system, the points it's got and the points that I enter . . . .
>
> . . . .
>
> And if those points are different – entered differently due to a nick or a scratch on the rolled finger that the computer sees as ridging, it may ignore the actual minutiae points that we enter on our latent fingerprint, that it disregards because it's got big nice clean ridge endings in clusters so it may skip everything that I'm searching for in false minutiae points.

Officer Finch explained to the jury how a computer could fail to provide a match but the examiner could discern a match. The jury resolved all factual disputes raised by the evidence and accredited the testimony of Officer Finch. *See Bland*, 958 S.W.2d at 659. We will not disturb the jury's verdict. Appellant is not entitled to relief on this issue.

### C. The Trial Court's Failure to Poll the Jury as to Michelle Smith's Status as an Accomplice

Appellants both claim that the trial court erred by failing to poll the jury on whether it found Michelle Smith to be an accomplice. They argue that "Ms. Smith was never introduced by the Court or the State as a potential accomplice witness. The jury was never asked to consider the need for corroboration for Ms. Smith's testimony during its deliberations."

As set forth fully above, the trial court defined "accomplice" and "corroboration" in its jury instructions. It then instructed the jury with regard to how to evaluate the evidence in light of whether Ms. Smith was an accomplice.

Turning to the issue of polling the jury on Ms. Smith's status as an accomplice, we note that a trial court, "in which suits are tried by juries, in both criminal and civil cases, shall be required to poll the jury on application of either the state or the defendant in criminal cases and either the plaintiff or the defendant in civil cases, without exception." Tenn. Code Ann. § 20-9-508 (2010). Case law defines "polling" as "to ascertain by questions to jurors, individually, whether each assents to the verdict." *Dixon Stave & Heading Co., Inc. v. Archer*, 291 S.W.2d 603, 607-08 (Tenn. Ct. App. 1956). "[I]n the absence of a statute prescribing the method of conducting a poll of the jury, the method is entirely within the discretion of the trial judge, whose judgment will not be disturbed unless it clearly appears that there was abuse of discretion." *Davis v. Wilson*, 522 S.W.2d 872, 883 (Tenn. Ct. App. 1974) (quotations omitted). This court is unaware of any authority requiring a trial court to poll a jury on an issue other than whether each juror assents to the verdict, and the State correctly notes that appellant has provided no authority in support of such a request. "Issues [that] are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Waiver notwithstanding, we conclude that the trial court did not abuse its discretion, and we deny relief on the merits of this issue.

### D. The State's Failure to Provide Pre-Trial Notice of its Intent to Introduce Evidence of Other Crimes, Wrongs, or Acts Pursuant to Rule 404(b)

Appellant Destiny Hurst challenges the admission of 404(b) evidence of other crimes, wrongs, or acts. *See* Tenn. R. Evid. 404(b). She claims that the State failed to provide pre-trial notice of its intent to introduce such evidence, and that because of the State's failure, she was prejudiced. It is noteworthy that appellant does not challenge the trial court's ruling but only challenges the State's failure to provide notice of its intent to use the evidence.

The State introduced evidence through Michelle Smith, Joseph Harrison, James Adair, Donna Grubbs, and Jamie Rupp concerning appellant Destiny Hurst's illegal activities, which Ms. Smith referred to as "hustling." The State offered testimonial evidence as well as video surveillance and a transcript of Mr. Harrison's 9-1-1 call. All of the evidence, set forth above, demonstrated appellant's stealing or attempting to steal from Kohl's, Lowe's, and Home Depot.

Contrary to appellant's assertion, Rule 404(b) itself does not contain a notice provision; it does, however, require a jury-out hearing prior to introduction of the evidence. The trial court held the required jury-out hearing, after which the following exchange occurred:

COUNSEL (DH)[4]: Requiring pretrial notice, we've not received any. We've asked for it in our own motion, and at this point we're not allowing –

STATE: 404(b) doesn't require pretrial notice, it just requires a jury out hearing. I mean, again, they're on notice because I provided all of this to them in discovery. 404(b) does not require pretrial notice.

COURT: If you have provided it in discovery[,] that takes care of it. Now, they're saying . . . it's the notice to use.

STATE: Notice to use is not required under 404(b).

COURT: Yeah, no.

COUNSEL (RH): We do – we have that in the discovery.

COURT: Okay. If it got to them in discovery[,] then there's no unfair surprise here.

We find no authority, and appellant directs us to none, dictating that the State provide pretrial notice of intent to use 404(b) evidence. To the contrary, this court has stated that "the State was not required to file its written notice of proposed Rule 404(b) evidence prior to trial." *State v. David Kyle Gilley*, No. M2003-00499-CCA-R9-CD, 2004 WL 367705, at *1

---

[4] For purposes of this exchange, we will refer to counsel for appellant Destiny Hurst as "Counsel (DH)" and appellant Robert Hurst as "Counsel (RH)."

(Tenn. Crim. App. Feb. 26, 2004), *rev'd on other grounds*, 173 S.W.3d 1(Tenn. 2005). In addition, appellant received all of the evidence, including the video surveillance and 9-1-1 recording, in discovery; thus, appellant had notice of the evidence and even advised the court prior to the beginning of trial, "I think also if we go to any character evidence that may come out, there may be some statements about my client's propensity for violence and things of that nature." Because the State complied with discovery as dictated by Rule 16 of the Tennessee Rules of Criminal Procedure, appellant is not entitled to relief on this issue.

### E. The Trial Court Erred in Characterizing Appellant Destiny Hurst as a Career Criminal, Sentencing Her at the Top of Her Range, and Ordering Consecutive Sentences

Appellant Destiny Hurst claims several errors with respect to the trial court's sentencing her: (1) the trial court considered an incorrect number of convictions; (2) the trial court considered one offense for which appellant was not convicted; (3) the trial court incorrectly applied enhancement factors, including exceptional cruelty, that were elements of the offense; and (4) the trial court erred in ordering consecutive sentences.

### 1. Standard of Review

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -210(b) (2010); Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010 & Supp. 2012).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012); Tenn. Code Ann. § 40-35-210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record

"what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id*. at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

2. Trial Court's Sentencing Order

In its sentencing order, the trial court first found appellant to be a Range II offender. It then found the following enhancement factors: (1) Factor (5), that appellant treated or allowed the victim to be treated with exceptional cruelty, based on the testimony of the medical examiner that the knife wounds would have been fatal, but appellants then tried to strangle the victim while he lay helpless on the floor; (2) Factor (8), that appellant has failed to comply with the conditions of a sentence involving release into the community; and Factor (13), that at the time of the offense, appellant was on probation for a theft conviction from Jefferson County. Tenn. Code Ann. § 40-35-114(5), (8), (13) (2010 & Supp. 2012). The trial court noted that although it found three enhancement factors, two of the factors were based on the same violation of probation; thus, it did "not set her sentence at the maximum end of the range." The court imposed a sentence of thirty-five years.

The trial court next considered sentence alignment and ordered consecutive sentencing based on its finding that appellant "is a professional criminal who has knowingly devoted her life to criminal acts as a major source of livelihood." Tenn. Code Ann. § 40-35-115(b)(1) (2010). It based this finding on appellants' supporting themselves and their pill addiction by "hustling." The court also found that appellant "is an offender whose record of criminal activity is extensive" based on her seven prior felony convictions, including a 1993 conviction for conspiracy to take a human life,[5] a 1998 conviction for conspiracy to commit murder, and a 2010 conviction for aggravated burglary. *Id.* § 40-35-115(b)(2). Based on finding two of the statutory factors permitting imposition of consecutive sentences, the trial court ordered appellant's thirty-five year sentence to be served consecutively to her sentence of life imprisonment.

### 3. Appellant's Offender Range

Appellant's presentence report indicates that she was convicted of aggravated burglary in 2010; criminal trespass in 2008; theft of property, Class E felony, in 2009 (two unrelated counts); theft of property, Class A misdemeanor, in 2008 (five unrelated counts spanning 2006-2008); resisting arrest in 2007; and conspiracy to commit murder in 1998. Our review of the judgment forms indicates that the trial court noted that appellant was a standard offender for the murder convictions but did not note a sentencing range for her especially aggravated robbery convictions.[6] However, in it sentencing order, the trial court confirms that it sentenced appellant as a Range II offender, and its imposition of a thirty-five year sentence for especially aggravated robbery supports that statement. *See* Tenn. Code Ann. § 40-35-112 (2010) (noting that the range of punishment for a Range II offender convicted of a Class A felony is twenty-five (25) to forty (40) years). That was the lowest release eligibility classification for which appellant qualified, as she had been convicted of at least four prior felonies. *See* Tenn. Code Ann.§ 40-35-109 (2010). Even if the trial court considered one conviction, as appellant argues, incorrectly, she was not prejudiced by the trial court's sentencing her as a standard offender.

Contrary to appellant's assertion, the number of prior convictions does not equate to the number of years to which a trial court sentences a defendant, although it would impact the sentencing range. Inasmuch as appellant's argument may be construed as the trial court's

---

[5] The State lists a 1993 conviction for conspiracy to take a human life, and the trial court noted said conviction in sentencing appellant Destiny Hurst. However, the presentence report does not contain such a conviction. This is without relevance to a determination of her sentencing range, because the trial court sentenced appellant at the lowest classification for which she was eligible.

[6] We instruct the trial court to note appellant's status as a Range II offender on the corrected judgment forms.

improperly considering an incorrect number[7] of convictions in finding her to be a professional criminal, we reiterate a prior conclusion from this court: "[T]he defendant's sparse employment history coupled with the sheer number of [her] prior convictions supports a determination that [she] is[,] indeed[,] a professional criminal." *State v. Allen Prentice Blye*, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *12 (Tenn. Crim. App. Nov. 1, 2002), *perm. app. denied* (Tenn. 2003). Appellant is not entitled to relief on this issue.

### 4. Applicability of Enhancement Factors

Appellant also contends that the trial court erred in applying the exceptional cruelty enhancing factor because it was an element of the offense of especially aggravated robbery. Our supreme court has held:

> [W]e first note that "exceptional cruelty" is not an element of especially aggravated robbery. Tenn. Code Ann. § 39-13-403(a)(2)(1991). Moreover, we conclude that proof of serious bodily injury, which is an element of especially aggravated robbery, does not necessarily establish the enhancement factor of "exceptional cruelty." In other words, the facts in a case may support a finding of "exceptional cruelty" that "demonstrates a culpability distinct from and appreciably greater than that incident to" the crime of especially aggravated robbery. *See State v. Jones*, 883 S.W.2d at 603. If so, a sentence may be properly enhanced on this basis.
>
> As the Court of Criminal Appeals has explained, the "trial court should state what actions of the defendant, apart from the elements of the offense, constituted 'exceptional cruelty.'" *State v. Goodwin*, 909 S.W.2d 35, 45 (Tenn. Crim. App. 1995).

*State v. Poole*, 945 S.W.2d 93, 99 (Tenn. 1997).

In accordance with established case law, the trial court stated what actions, apart from the elements of the offense, constituted "exceptional cruelty." It noted that despite inflicting numerous stab wounds upon the victim, which would have been fatal, appellant attempted, unsuccessfully, to strangle the victim with a belt with enough force to cause a "compression

---

[7] We note for the record that the trial court stated that appellant had seven felony convictions. Our review of her criminal history, as contained in the presentence report, lists four felony convictions and seven misdemeanor convictions. Regardless of whether her felonies numbered four or seven, the record is nonetheless sufficient to support the trial court's finding appellant to be a professional criminal and imposing consecutive sentences.

abrasion" on the victim's neck that ran from the right side of his throat to the corner of his jaw horizontally along his neck. The trial court did not abuse its discretion in determining that appellant Destiny Hurst treated the victim with exceptional cruelty.

## 5. Consecutive Sentence Alignment

The determination of whether to order consecutive rather than concurrent sentences is a matter primarily within the discretion of the trial court. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). The procedure is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the seven statutory criteria exists. Tenn. Code Ann. § 40-35-115(b) (2010). Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." *Id*. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id*. § 40-35-103(2).

The record supports the trial court's conclusion that appellant was a professional criminal based upon appellants' supporting themselves by "hustling." Tenn. Code Ann. § 40-35-115(b)(1) (2010). We reiterate that her "sparse employment history coupled with the sheer number of [her] prior convictions supports a determination that [she] is[,] indeed[,] a professional criminal." *Allen Prentice Blye*, 2002 WL 31487524, at *12. Based on her criminal history, the trial court properly found that appellant "is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2) (2010). The trial court did not abuse its discretion in ordering appellant Destiny Hurst to serve her sentences consecutively.

## III. Merger

While the trial court recognized that merger of all of appellants' convictions for murder into their conviction for first degree premeditated murder and merger of their dual convictions for especially aggravated robbery would be proper, the judgments fail to reflect merger of these convictions. *See State v. Banes*, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993) (noting that pursuant to the doctrine of merger, the lesser conviction merges with the greater offense, resulting in one judgment of conviction), *rev'd on other grounds, State v. Williams*, 977 S.W.2d 101 (Tenn. 1998). Accordingly, we remand this cause for entry of a single judgment form for each appellant reflecting merger of all murder convictions into Count 6, first degree premeditated murder; and entry of a single judgment form for each appellant reflecting merger of both counts of especially aggravated robbery. *See State v. Forrest*

*Melvin Moore, Jr.,* No. M2012-02059-CCA-R3-CD, 2013 WL 3874934, at *6 (Tenn. Crim. App. July 25, 2013).

## CONCLUSION

Based on our thorough review of the record, the applicable legal authorities, the briefs of the parties, and the arguments of counsel, we affirm appellants' convictions and sentences. We remand this cause for entry of corrected judgments as set forth *supra* and order entry of a judgment of not guilty for appellant Destiny Hurst's conviction for Count 12, knowingly employing a firearm during the commission of a dangerous felony after having been previously convicted of the same. We also order correction of appellant Destiny Hurst's judgment forms to reflect that her sentence for especially aggravated robbery should be served consecutively to her life sentence for murder. In addition, the judgment should reflect her Range II offender status.

_____
ROGER A. PAGE, JUDGE